J-S36031-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: F.P., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: J.J.V., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 683 WDA 2025 |

Appeal from the Order Dated May 12, 2025
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-0000093-2024

| | | |
|---|---|---|
| IN THE INTEREST OF: A.R.P., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: J.J.V., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 684 WDA 2025 |

Appeal from the Order Dated May 12, 2025
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-0000094-2024

BEFORE:   PANELLA, P.J.E., NICHOLS, J., and FORD ELLIOTT, P.J.E.[*]

MEMORANDUM BY FORD ELLIOTT, P.J.E.: **FILED: NOVEMBER 12, 2025**

J.J.V. (Father) appeals from the orders involuntarily terminating his

parental rights to his biological children,[1] F.P. (born 8/2019) and A.R.P. (born

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] The orphans' court found that counsel for Children could represent both their legal interests and best interests without conflict.  **See** Order, 11/21/24; **see**
*(Footnote Continued Next Page)*

11/2020) (collectively, Children), pursuant to Sections 2511(a)(1), (2), (5), and (8), and Section 2511(b) of the Adoption Act.[2] *See* 23 Pa.C.S. §§ 2101-2938. After careful review, we affirm.

The orphans' court set forth the facts of this case as follows:

[. . .] On June 6, 2023, [Allegheny County Office of Children, Youth and Families (CYF)] obtained an emergency custody authorization [ECA], and [C]hildren were [removed from Father and their biological mother's care and] placed in [CYF's] care. [Children] were adjudicated dependent on August 16, 2023. CYF filed [a] petition for involuntary termination of parental rights on October 7, 2024.

Morgan Mader, a CYF caseworker, testified that she initially began working with the family in September of 2022. However, CYF's involvement with the family began in November 2019 when F.P., who was an only child at the time, was removed from the home as a result of Mother's substance use. F.P. was placed in a foster home through Auberle[3] and was not returned to Mother's care until January 2021. CYF kept the case open from January 2021 to July 2022 because [C]hildren were behind on specialty care and CYF wanted to ensure that Mother was up to date on their medical appointments[, such as] dermatology appointments to treat eczema. A.R.P. was also diagnosed with autism and recommended for services including speech therapy.

---

also *In re Adoption of K.M.G.*, 240 A.3d 1218, 1235-36 (Pa. 2020) (noting that before appointing individual to serve as both guardian *ad litem* and legal counsel for child, trial court must determine whether counsel can represent such dual interests, and where trial court appoints one attorney to represent both best and legal interests, appellate courts should review *sua sponte* whether trial court found no conflict exists).

[2] The orphans' court also terminated Children's biological mother's (Mother) parental rights.

[3] Auberle is a nonprofit human services provider.

CYF closed out Mother's case in July 2022. Father's name was unknown to CYF at that time[. . . . O]n May 26, 2023, CYF was notified that Mother left [C]hildren with a friend on April 28, 2023, and had not returned to get them. Mother told [Caseworker] Mader that she would [retrieve C]hildren that day, but when [Caseworker] Mader arrived at a hotel to meet Mother on May 26th, [C]hildren were not there. Mother explained that she left [C]hildren at her friend's house because she needed to recover from an infection in her arm. [Caseworker] Mader offered to drive [Mother] to [Children], but Mother declined, stating that she could [retrieve] them herself.

The next time CYF visited Mother and [C]hildren was May 30, 2023. During that visit, Mother provided [a] record of her hospital stay for her infected arm. The record reported that the infection was related to [intravenous] drug use and Mother admitted that she was using heroin when [C]hildren were not around. Following her admission, CYF gave Mother an opportunity to make a plan for herself and [C]hildren. Mother then called Valerie Pegg, a family friend, and asked her to watch [C]hildren while she went into detox[ification]. [On May 30, 2023, Mother] informed CYF that [] Pegg was [C]hildren's paternal grandmother and disclosed [Father's] identity [to CYF] for the first time[.]

On June 6, 2023, [C]hildren were removed from Mother and Father's care[. . . . Caseworker] Mader was able to speak with [Father] that day, after CYF located three potential numbers for him. [Caseworker Mader] informed [Father] that he was named as the potential father for [Children]. Father denied paternity, insisting that it was a joke, and ended the call. [Caseworker] Mader's subsequent attempts to contact Father were met with insults, threats to press charges, and his continued denial of his paternity.

On June 7, 2023, [Caseworker] Mader texted Father and asked him if he would be willing to complete a paternity test for [Children]. [Father] declined and threatened to make [Caseworker Mader's] life miserable if she contacted him again. [Caseworker] Mader informed [Father] about the shelter care hearing [] scheduled for June 9, 2023, and provided him with information on how to obtain counsel through the Juvenile Court Project. Father did not appear at the hearing. [C]hildren were removed and placed with Mother's aunt and uncle, Michael and Michelle Perry, from June 6, 2023, to June 13, 2023. This was a

temporary placement due to[, *inter alia*, the Perrys'] health issues[. . . .]

[C]hildren were ultimately placed in a traditional foster home with Tim and Christy Russo from June 13, 2023, to September 8, 2023. While in this placement, [Children] continued to have regular visits with [Mother's] family members[.] As a result, John and Angela Gibson [(together, Foster Parents), met C]hildren and form[ed] a relationship with them. John [(Foster Father)] is Mother's biological cousin, and Angela [(Foster Mother)] is [Mother's] cousin through marriage. In August 2023, [Foster Parents] asked CYF [to] be assessed as a placement option. On September 8, 2023, upon approval, [C]hildren were placed in [Foster Parents]' care[ and] have remained [there] ever since.

[Caseworker] Mader testified that family service plan meetings were scheduled for June 22, 2023, December 20, 2023, June 16, 2024, and January 9, 2025. Father was not informed about the 2023 and June 2024 meetings because CYF did not obtain his contact information until January 2025. However, a notice regarding the January 9th family service plan meeting was sent to him.

Prior to the filing of the termination petition in October 2024, CYF completed three diligent searches for Father on June 6, 2023, August 5, 2023, and February 15, 2024. During the first two searches, CYF was able to find two addresses [] associated with him[: o]ne of those addresses belonged to [] Pegg[.] The final diligent search was conducted on February 15, 2024[, but n]o new addresses were found. On June 29, 2023, CYF texted Father about an upcoming dependency hearing using a [phone] number [it] previously used to contact him and received a response from someone saying that [it] had the wrong number. [. . .] When Father was sent termination paperwork on October 29, 2024, CYF learned that he had been incarcerated at the Allegheny County Jail [(ACJ)] since September 2024. [. . .]

[Caseworker] Mader was not sure when Father was released from the ACJ, but she testified that he reached out to CYF in January 2025 and provided a current address. CYF sent notifications regarding upcoming hearings to that address. No family plan service meetings were scheduled for Father because he refused to work with the services CYF referred him to. [. . .]

Father did not start participating in supervised visits with [C]hildren until 2025. This was the first time throughout the life

of the case that [Father] was in contact with [C]hildren. [Father] was also in a group chat with [Caseworker] Mader and [C]aseworker[] Ruth Weaver. Though [Father] was responsive in the group chat, [Caseworker] Mader testified that he was not cooperative. [Father] was adamant about not needing services, particularly ones pertaining to drug[s] and alcohol. CYF had ongoing drug and alcohol concerns because [Father] had a history of selling drugs and [testing positive for drugs]. [Father] completed one drug test throughout the life of this case but refused to do others. Father also did not believe he needed supervised visits or therapeutic interactions with [C]hildren, nor did he appreciate the impact seeing him—a virtual stranger to them—had on the[m].

Father claimed that he had been in [C]hildren's lives since birth. He informed [Caseworker] Mader that he was aware of CYF's involvement since the first time F.P. was removed from Mother's care. [Father] claimed that he snuck out the back door whenever CYF made house visits. He also admitted to knowing that Mother and [C]hildren were living out of hotels prior to removal. [Father] cited fear of arrest because he had been on the run [from warrants for his arrest] for seven years as one of the primary reasons why he did not offer to take [C]hildren when CYF obtained the ECA.

[Caseworker] Mader also [testified] about [Foster Parents, who] were appointed [as] primary educational and medical decision[-]makers as of April 11, 2025. CYF did not have any concerns regarding [Foster Parents]' care. [Caseworker] Mader testified that [C]hildren were thriving in that placement. A.R.P., who was non-verbal for a long time, started talking more while in their care. [Caseworker] Mader further testified that she observed a loving and affectionate bond between [C]hildren and [Foster Parents]. [C]hildren sought out [Foster Parents] for comfort when new people were around. [Caseworker] Mader also noticed that [C]hildren did not like to leave [Foster Parents]' home to visit with Mother and, more recently, Father.

[Caseworker] Mader expressed that she would be concerned if [C]hildren were removed from [Foster Parents]' home because of the progress [Children] made in the last three years. [Foster Parents] provided the most stable environment [C]hildren [ever] had[.] Thus, CYF believed that termination of Mother and Father's parental rights would best serve [C]hildren's best interests. [Caseworker] Mader did not think [C]hildren would suffer any

detriment if Father's rights were terminated, and that it would be more harmful to end their relationship with [Foster Parents].

[. . . Caseworker] Weaver testified that she was [assigned] the case starting [in] July/August 2024. She further testified that her first contact with Father was on January 18, 2025, when he reached out to CYF's intake department and requested a call. [Caseworker] Weaver and [Caseworker] Mader, contacted Father on January 24, 2025, to conduct a phone interview. During the interview, [Father] disclosed that he kicked Mother out of his home and filed a [Protection from Abuse Act petition] against her. He also expressed concern that CYF would arrest him for open warrants and told them that he had been on the run for seven years.

Father reported that he last saw [C]hildren in May of 2023 at a hotel. [Father] also reported having a [UPMC Western Psychiatric Hospital] therapist and a prescription for benzodiazepine for a cardiac problem. However, [Caseworker] Weaver was not able to confirm this information because [Father] refused to sign Release of Information [(ROI)] forms[.] Apart from the phone assessment, Father did not complete any other assessments with CYF. [Father] initially agreed to [complete] a [Pennsylvania Organization for Women in Early Recovery (POWER)[4]] assessment, but he never [did so]. On February 13, 2025, Father [withdrew his consent] to complete a POWER assessment because he was concerned about the screening portion. [Father] claimed that many of his friends had received faulty drug screens through POWER. Father reported that he went to Greenbriar, a drug and alcohol rehabilitation center, for mental health purposes[, but] admitted that he was asked to leave that program and did not successfully complete it. [. . .]

On February 13, 2025, CYF referred Father to [(GSM Therapeutic and Consulting Services (GSM)[5]] for therapeutic services because he had not been in contact with [C]hildren for two years, and it was unclear whether [Children] would remember [him] and his relationship to them. A.R.P. also ha[s] autism spectrum disorder with limited vocabulary and CYF wanted to ensure that there was

_____

[4] POWER is a substance abuse treatment and rehabilitation organization.

[5] GSM is a behavioral health practice.

- 6 -

therapeutic intervention in place when the visits began. The first GSM visit [was not scheduled] immediately after the referral [] because [Caseworkers] Weaver and [] Mader felt [it] appropriate for [C]hildren's initial visit with Father to [occur] with people they knew and [with whom Children were] comfortable[.]

[Caseworkers Mader and Weaver supervised a] visit [with Children and Father that] occurred on February 7, 2025. [Caseworker] Weaver testified that [C]hildren did not have a negative reaction to Father but felt that was mainly attributed to her and [Caseworker] Mader's presence. [Caseworker Weaver] observed that it took Father a little time to warm up to [C]hildren. [Father] initially brought tablets for [Children] to play with but once [Caseworker] Mader demonstrated how to play with [Children], [Father] became more engaged throughout the visit. A.R.P. interacted with [Father] a little bit, while F.P. played independently. That visit lasted for an hour.

The initial GSM visit was scheduled for March 14, 2025, but was cancel[]ed by Father a few hours prior to the visit due to a medical emergency. Father only reported the nature of the emergency to GSM. The next GSM visit was scheduled for March 28, 2025, but it was cancel[]ed because [C]hildren were sick. An attempted makeup visit was scheduled on April 4, 2025, but there was [an issue] with the transportation provided by A Second Chance.[6] Another makeup visit was scheduled for April 11, 2025, but Father reported that he was out of town for work. Thus, the first GSM visit occurred on April 18, 2025. During that visit, [Caseworker] Weaver observed that Father had trouble controlling [C]hildren's behaviors. F.P. ran out of the visiting room several times throughout the visit. Father needed assistance from the GSM clinicians that were present to get [F.P.] back into the room. However, [Father's] interactions with [C]hildren were positive overall. [Father] brought toys for [Children] to play with and picked them up and spun them around, which [C]hildren seemed to enjoy. [Caseworker] Weaver testified that [C]hildren did not seem fearful of Father but noted that there were two people present throughout the visit. Another visit occurred on April 25, 2025, but only F.P. was in attendance. A third visit was scheduled for the same day and time as the contested [termination of parental rights] hearing, but it was cancel[]ed and rescheduled for

_____

[6] A Second Chance is a nonprofit kinship services provider.

the following week. A total of seven GSM visits were scheduled, but only four of them occurred.

Father expressed that he wanted [C]hildren back but felt that the supervised and therapeutic visitation was unnecessary. [Father] believed that, as long as he had housing, CYF would return [C]hildren to him. [Caseworker] Weaver informed him that that was not true. Father continued [to be un]willing to complete a drug and alcohol assessment. However, [Father] signed a ROI for CYF to get a screen result from Crossroads, his [S]uboxone provider. [Father] sent [Caseworker] Weaver a picture of his screen results and a video of a urine cup with markings on it[,] but she was unable to interpret the markings.

[Caseworker] Weaver also [testified] about [C]hildren's relationship with [Foster Parents]. [Caseworker Weaver] visited [Foster Parents'] home at least once a month and observed that [C]hildren were bonded with [Foster Parents]. When [Caseworker] Weaver visited [Foster Parents'] home the week of the contested [termination of parental rights] hearing, F.P. asked her how to write "I love you, Angela and Johnny." A.R.P. was curled up with [Foster Father] during the visit. [Caseworker] Weaver further observed that when [C]hildren had questions, they turned to [Foster Parents]. [Foster Parents] also provided [Children] with a stable environment and participated in all of their medical and developmental needs. [Caseworker] Weaver stated that [C]hildren's needs were being met, and [Foster Parents] seemed very happy, and invested in [C]hildren's care.

[Caseworker] Weaver further testified that CYF referred the family to Dr. [Terry] O'Hara for two sets of evaluations. The first set occurred in October of 2024[, consisting of] an individual and interactional [evaluation] between the [Gibsons] and [C]hildren, and an individual and interactional [evaluation] with Mother and Father. The latter did not happen because Mother and Father failed to show up for their evaluations. The second set of evaluations were conducted in February 2025 between Father and [C]hildren.

[Caseworker] Weaver indicated that Father [was un]involved with the case until after October 7, 2024, when the termination petition was filed. Father did not complete any of his court[-]ordered goals. Furthermore, [at the time of the termination hearing, C]hildren ha[d] been out of their [biological] parents' care for

twenty-three months and [in Foster Parents'] care for twenty of those months.

Lori Marshall, a foster care caseworker at A Second Chance, testified that she became familiar with the family in February 2024, when she took over for the original caseworker. [Caseworker] Marshall did not work with either [biological parent], but she did visit [Foster Parents'] home once a month. In the foster home, [Caseworker Marshall] observed that [C]hildren get everything they want and received a lot of attention. Whenever she visited the home, at least one of [Children] was sitting on a foster parent's lap. [Caseworker Marshall] also testified that [C]hildren seemed happy, content, and secure in their placement. [Caseworker] Marshall was notified that F.P. cried after the interactional [evaluation] because [F.P.] feared that [Foster Parents] would leave her. [Caseworker] Marshall did not have any concerns about [Foster Parents'] home.

[. . . POWER Intake Supervisor Kevin] Hoover testified that referrals were made for Father on January 24, 2025, and April 11, 2025.

\* \* \*

[In connection with the first POWER referral, on] January 30, 2025, Father requested that the [POWER] assessment and drug screening be completed at the same time[, which were both scheduled for] February 6, 2025. However, a note indicated that the assessment was not completed on that date due to [Father's] refusal to take a drug screen. POWER attempted to schedule another drug test, but Father [stated his desire to test with] an alternative provider. [Father] was referred back to his case[ ]worker to discuss his options.

\* \* \*

[POWER did] not complete[ an assessment] for the second referral due to [an] inability to [] contact [] Father. Father requested a callback when [POWER's] assessment specialist spoke with him on April 14, 2025. However, [the clinical record contained] no indication of a callback [and t]he April 14, 2025, call was the last contact POWER [made] with Father.

Tarraca Jackson, a manager at the Allegheny County Health Department[] Drug and Alcohol Screening Program, testified that Father completed one screen on March 3, 2025. [Father] was

called in for nine additional screens, but he did not complete any of them. The outcome of the March 3, 2025[] screen was that [Father] tested positive for cocaine, opiates, and buprenorphine. Father did not acknowledge any of these [positive indications], so the results of the screen were sent to LabCorp along with a request for fentanyl and synthetic opioid testing. Cocaine and norfentanyl came back positive from LabCorp. The fentanyl and opiate screens came back negative.

[. . . Foster Mother] testified that she was a pre-adoptive resource and that she wanted to adopt [C]hildren. As of September 8, 202[3], [C]hildren had been in her and her husband's care[.] She testified that A.R.P. was in speech therapy both at school, and through an outpatient program that they participated in with her. F.P. started mental health and behavioral therapy two months before the contested [termination of parental rights] hearing. After [C]hildren's first visit with Father, [Foster Mother] observed that they did not know who he was. F.P. referred to him as "a man." [Foster Mother] testified that, after the evaluation with Dr. O'Hara, F.P. said to her "Joey's my first dad." When [Foster Mother] asked [F.P.] to explain, [F.P.] responded[,] "Well, he was my first dad, Tim is my second dad, and Uncle Johnny's my third dad." Tim was one of the previous foster parents. [Foster Parents] enrolled F.P. into therapy to address the confusion.

[Foster Mother] also testified that F.P. woke up from nightmares every night following the evaluation. [Foster Mother] noticed that [C]hildren had more outbursts and exhibited bad behavior during visits. They also started getting into fights with each other. When the DNA results came back, and Father's paternity was confirmed, [Foster Mother] explained to A.R.P. and F.P. that "Joey" was their [biological] father. However, [C]hildren continued to refer to him as ["]Joey["].

[. . . Father] testified that he first learned of CYF's involvement with [C]hildren in June of 2023 through Mother. She told him that he was named as the father of [C]hildren and wanted him to deny his paternity when CYF contacted him. When he asked why, Mother told him that it was because he had an open warrant and that CYF would arrest him. He believed her because CYF showed up to their house with the police in the past.

Father testified that he did not engage with CYF [until January 2025] because he was just released from the ACJ after a year and a half and still had a warrant for his arrest in Westmoreland

- 10 -

County. When CYF initially contacted him [in 2023], [Father] thought that it was one of Mother's friends trying to find out where he lived[] and did not believe it was CYF because he never received any paperwork. Father did not believe it was CYF contacting him until they reached out to [Pegg]. He told [CYF] not to contact him and changed his number to avoid being arrested.

Father further testified that he was in contact with [C]hildren until they were removed. In January 2024, he moved to California and lived there until May 2024. He came back to Pittsburgh when [Pegg] told him that [C]hildren were being removed because of Mother's drug use. When he returned to Pittsburgh, he stayed with [Pegg] and got an apartment on East Carson Street about two months later. He cited getting [C]hildren back and helping Mother get clean as his reasons for moving into his own apartment. Mother moved in with him not long after he got the apartment because she was staying at a hotel a few blocks away from where he lived. In August 2024, he asked [Mother] to leave because he found out that she was on methadone and still using fentanyl. In September 2024, [Father] was incarcerated due to a 2017 arrest from Westmoreland County. During his incarceration, he reached out to [Foster Father] three times because he saw [C]hildren at a visit prior to his incarceration and wanted to maintain contact. He testified that he was in contact with Mother and [C]hildren from May to September 21st, the date of his incarceration. [Father] said that he supported Mother and provided [C]hildren with clothing and toys[ during that period].

Father further testified that he was not contacted by CYF while he was incarcerated outside of [his receipt of] the termination [of parental rights] paperwork[. That communication] was the first time that he heard from CYF in the two years since he told them to stop contacting him. Father did not attempt to contact CYF while he was incarcerated because he did not know how. He was released from the ACJ on January 14, 2025, and contacted CYF three days later[,] on January 17, 2025. [Father] did not contact CYF until he was released because he believed he could not visit [C]hildren with an open arrest warrant. [Father] stated, "If they know I had warrants, they would have put me in jail, you know."

Father also testified that he has a heart condition called [s]upraventricular [t]achycardia [(SVT), which] causes his heart to beat really fast. He had an appointment [through] Mercy [Health Systems] scheduled two weeks after the contested

[termination of parental rights] hearing, as a prerequisite to surgery. He further testified that he did not have drug and alcohol history. He was prescribed Klonopin and Clonazepam for his SVT, but the jail took him off of those medications when he was incarcerated. He was told that he would go through withdraw[al] and put on the detox[ification] floor[,] where he was given [S]uboxone. At the time of the contested [termination of parental rights] hearing, Father was working with Crossroads, a treatment center, to get off the [S]uboxone.

Father denied ever selling drugs in the past and said that the caseworker misheard him. He also said that [he] refused to do the at-home drug screen for POWER because he took one in the past and had a false positive for methadone. It was sent to a lab where it came back negative. He spoke to [a] woman at POWER about not feeling comfortable doing an at-home drug test and was told that she would not be able to complete the assessment. He later contacted [Caseworker] Weaver and told her that he would be willing to take a drug test somewhere else, as long as it was not at home.

Father testified that he provided [a] signed [] ROI for Crossroads, but only for the screens because he did not feel comfortable giving CYF any more information. He also provided [an] ROI from Greenbriar. Father further testified that he was engaged in mental health treatment at Bellefield Tower from May 2024 to the time of his incarceration in September 2024. He was getting mental health treatment to address anxiety related to his SVT.

Father told the court that all of his criminal matters were resolved, and that he had about four to six months [] of probation [remaining]. He disagreed with testimony [about his failure to comply with] CYF [requests and indicated he completed] the evaluation, visits with [C]hildren, the DNA test, and a home assessment. He acknowledged that he had not completed [a] POWER [assessment] but was currently working on fixing that. He was just waiting for someone from POWER to contact him.

As for visitation, Father testified that the visits were going well and that he got so excited after them. He had a lot of pictures from the visits of [him and Children] playing. F.P. also drew a lot of pictures for him. Some of the pictures said "Daddy" and depicted them standing next to each other. He further testified that he was aware of A.R.P.'s autism diagnosis. After he found out, he researched autism and secured a babysitter. He also

looked into schools for autistic girls that provided transportation so he could continue working. Father testified that there are always a lot of people in his home, including cousins, his fiancée and her two sons, and his nieces and nephews. He opposed termination because he believed he was capable of being a father to [C]hildren.

Orphans' Court Opinion, 7/10/25, at 2-21 (unpaginated; some quotation marks, footnotes, paragraph break, and unnecessary capitalization omitted).

On May 12, 2025, the orphans' court granted CYF's petition to involuntarily terminate Father's parental rights to Children, pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b). Father timely appealed,[7] and he and the court complied with Pennsylvania Rule of Appellate Procedure 1925. **See** Pa.R.A.P. 1925(a)(2)(i).

On appeal, Father presents the following issues for our review:

1. Whether the trial court abused its discretion and/or erred as a matter of law by finding that CYF met its burden of proof by clear and convincing evidence thereby granting the petition to involuntarily terminate Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1)?

2. Whether the trial court abused its discretion and/or erred as a matter of law by finding that CYF met its burden of proof by clear and convincing evidence thereby granting the petition to involuntarily terminate Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(2)?

3. Whether the trial court abused its discretion and/or erred as a matter of law by finding that CYF met its burden of proof by clear and convincing evidence thereby granting the petition to involuntarily terminate Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(5)?

_____

[7] On June 24, 2025, our Court *sua sponte* consolidated Father's appeals at Nos. 683 WDA 2025 and 684 WDA 2025. **See** Pa.R.A.P. 513.

4. Whether the trial court abused its discretion and/or erred as a matter of law by finding that CYF met its burden of proof by clear and convincing evidence thereby granting the petition to involuntarily terminate Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(8)?

5. Whether the trial court abused its discretion and/or erred as a matter of law by finding that CYF met its burden of proof by clear and convincing evidence that termination of Father's parental rights would best serve the needs and welfare of the minor Children pursuant to 23 Pa.C.S. § 2511(b)?

Appellant's Brief, at 9-10.

Our Supreme Court has set forth the well-settled standard of review of a court's grant of a termination of parental rights petition, as follows:

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations, quotation marks, and brackets omitted). Further, "CYF must prove the grounds for termination of parental rights under 23 Pa.C.S. § 2511 by clear and convincing evidence." *Id.* (citation omitted). "[T]he trial court, as the finder of fact, is the sole determiner of the credibility of witnesses and all conflicts in testimony are to be resolved by the finder of fact." *In re C.P.D.*, 324 A.3d 11, 24 (Pa. Super. 2024) (citation and brackets omitted). "The standard of clear and convincing

evidence means testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue." ***Id.***

Moreover, we need only agree with the orphans' court as to "any one subsection of [Section] 2511(a), in addition to [Section] 2511(b), in order to affirm the termination of parental rights." ***In re M.E.***, 283 A.3d 820, 830 (Pa. Super. 2022).

> In evaluating whether the petitioner proved grounds under [Section] 2511(a), the trial court must focus on the parent's conduct and avoid using a balancing best interest approach. If the trial court determines the petitioner established grounds for termination under [Section] 2511(a) by clear and convincing evidence, the court then must assess the petition under [Section] 2511(b), which focuses on the child's needs and welfare.

***Id.*** (citations and quotation marks omitted).

Here, we limit our review to the orphans' court's analysis under Section 2511(a)(1). Section 2511(a)(1) states that parental rights to a child may be terminated if "[t]he parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties." 23 Pa.C.S. § 2511(a)(1).

On this issue, Father argues that "[t]his case presents a situation where the parent did engage in parental duties during the pre-petition period even though he was not engaged with the agency." Appellant's Brief, at 36. Father contends that he:

did not evidence a settled purpose to relinquish his parental claim to his Children. While Father's initial communications with CYF were heated, Father credibly testified: 1) Mother directed him to deny paternity on the threat he would face arrest; 2) he did not believe the initial calls/texts were CYF but Mother's friend trying to obtain his address to get him arrested; 3) he did reach out to [Foster Father] multiple times in July 2024 to inquire about [Children] and have contact with them; 4) during this time period he transported Mother to her visits and went into some of the visits at the library; 5) he rented his apartment upon return to the Pittsburgh area in the spring of 2024 for the sole purpose of having housing for [Children]; 6) he unwisely allowed Mother to move in because he thought he could help her with her addiction issues; and, 7) while she was there, and able to visit the Children, he purchased shoes, clothes, toys[,] and other goods for [Children].

*Id.* at 34-35. Father further faults CYF for failing to contact him after he instructed it not to do so—outside of serving him with the termination petition—until he reached out to CYF three days after his release from the ACJ in January 2025. *See id.* at 35-36. Father contends that the evidence supports his position because

in the months prior to the [filing of CYF's] October 2024 petition [to terminate Father's parental rights,] the girls [had an] immediate comfort level with him when he had his first visits in 2025. His appropriateness with the Children and [their] positive interactions with him, even after a time period of not seeing him, as observed by both CYF case workers and Dr. O'Hara speak to [Father]'s efforts and the fact he did not refuse to engage in parental duties.

Whether his fear was right or wrong about being arrested if he engaged with CYF, Father saw that as an obstacle and demonstrated a reasonable firmness to continue to be [Children's] Father even if it meant seeing them but leaving out the back door when CYF came to [Pegg's home], or going into the library when Mother had her visit, or buying necessities for them.

*Id.* at 37-38. We conclude that Father is not entitled to relief.

- 16 -

"Parental rights may be terminated pursuant to Section 2511(a)(1) if the parent either demonstrates a settled purpose of relinquishing parental claim to a child or fails to perform parental duties." **C.P.D.**, 324 A.3d at 26 (citation and emphasis omitted). "When evaluating a petition for involuntary termination of parental rights, the court may not consider the parent's efforts to remedy conditions described under subsection (a)(1)[] which are first initiated after receiving notice of the filing of the petition." **In re K.T.**, 296 A.3d 1085, 1094 n.9 (Pa. 2023); **see also** 23 Pa.C.S. § 2511(b).

Our Supreme Court has succinctly explained how courts should conduct their Section 2511(a)(1) analysis:

> Though we do not adhere to any strict definition of parental duty, a child has a right to essential parental care, and our jurisprudence reveals certain irreducible qualities of a parent's attendant obligation. Foremost, it is a positive duty requiring affirmative performance. Communication and association are essential to the performance of parental duty. Parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life. A parent must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship, or his rights may be forfeited. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs.
>
> However, even where the evidence clearly establishes a parent has failed to perform affirmative parental duties for a period in excess of six months, the court must examine the individual circumstances and any explanation offered by the parent to determine if that evidence, in light of the totality of circumstances, clearly warrants permitting the involuntary termination of parental rights. We have consistently emphasized the law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved. In this vein, a

- 17 -

wealth of Superior Court jurisprudence instructs trial courts deciding Subsection 2511(a)(1) cases to consider the whole history of a given case and not mechanically apply the six-month statutory provision, although it is the six months immediately preceding the filing of the petition that is most critical to the analysis.

In further consideration of the totality of circumstances, if competent evidence establishes the statutory criteria under Subsection 2511(a)(1), we then require three lines of inquiry: (1) the parent's explanation for his or her absence; (2) the post-abandonment contact between parent and child, including a parent's efforts to re-establish contact; and (3) consideration of the effect of termination of parental rights on the child pursuant to Subsection 2511(b). Unlike grounds for termination predicated on incapacity of the parent, the focus under Subsection 2511(a)(1) is not the degree of success a parent may have had in reaching the child, but examines whether, under the circumstances, the parent has utilized all available resources to preserve the parent-child relationship.

*In re Adoption of C.M.*, 255 A.3d 343, 364-65 (Pa. 2021) (citations, quotation marks, and brackets omitted).

As to the effect of a parent's incarceration on the court's consideration of a termination petition, this Court has previously explained that:

> Incarceration alone is not sufficient to support termination of parental rights under any subsection. [. . . A] parent's responsibilities are not tolled during incarceration, and[,] therefore[, the court] must inquire [into] whether the parent utilized those resources available while he or she was in prison to continue a close relationship with the child.
>
> \*   \*   \*
>
> [Moreover, i]n cases involving an incarcerated parent, this Court has emphasized that a parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment. The parent wishing to reestablish his parental

responsibilities bears the burden of proof relative to post-abandonment contact.

*In re Adoption of C.L.G.*, 956 A.2d 999, 1006 (Pa. Super. 2008) (en banc) (citations, quotation marks, and brackets omitted).

Instantly, in concluding the record contained clear and convincing evidence supporting terminating Father's parental rights to Children, the orphans' court found as follows:

> In the case before us, CYF filed the petition for involuntary termination of parental rights on October 7, 2024. Thus, Section 2511(a)(1) requires this court to consider the six[-]month period preceding the filing of the petition, which is April 7, 2024, through October 7, 2024. Father claims he has been in [C]hildren's lives since birth. However, that testimony does not align with the testimonies of [Caseworker] Mader and [Caseworker] Weaver. Both testified that Father only formally became involved with this case in January 2025, even though CYF initially contacted him two years prior. In that time, Father adamantly denied that he was the biological father of [C]hildren and refused to speak with CYF or submit to genetic testing.

> Though the six months leading up to the [filing of the] termination petition are important, the court must also consider the entire history of a case, the individual circumstances, and the explanations the parent facing termination gives for their failure to perform parental duties. Parental duty is best understood in relation to the needs of a child. These needs include but are not limited to love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Instead, parental obligations are a duty that requires affirmative performance. In other words, this court must consider how much a parent has exerted themselves to take and maintain a place of importance in the child's life. After review of the record, it is clear that Father has not exerted himself. If anything, he has continuously put his personal needs before the [C]hildren's and only started taking his involvement with this case seriously on his own terms.

> While Father did attend visits, there were only a handful of them, and each were scheduled after the termination petition was filed

because that is when he started taking his involvement with this case seriously. He also continuously refused to complete drug screens, offering up his own discomfort as the reason for why he was not completing them. CYF provides parents with goals, not for their own amusement, but because there are concerns that must be addressed before reunification is possible. These goals are not optional, and a parent who is serious about [reunification] with their children must make an effort to complete them and engage with the services required of them. Father has done neither of these things in the six months leading up to the filing of the petition.

Father testified that he researched autism spectrum disorder after learning about A.R.P.'s diagnosis but there was no testimony indicating that he has attended any medical or educational appointment for either child. This can mostly be attributed to the fact that Father was absent throughout the life of this case[] and did not formally make an effort to engage with CYF until it suited him to do so. Even if this court found his testimony about being in [Children's] li[ves] since birth to be credible, it would be his word against CYF's, and he has demonstrated that his word cannot be trusted.

As mentioned above, Father adamantly denied his paternity when he was initially contacted by CYF. He initially testified that Mother told him to deny his paternity when CYF contacted him because he had an open warrant. He later stated that he did not get involved with CYF because he feared it would result in him getting arrested, multiple times throughout his testimony, with no further mention of Mother.

\*　　\*　　\*

Here, Father has not made any progress towards his goals. At the time of the [termination of parental rights] hearing, CYF still had concerns about his drug and alcohol history. Not only did he refuse to complete more than one drug screen, but he only signed ROIs for screens, and not for any additional information that would paint CYF a clearer picture of [his progress] with his drug and alcohol goal. Father insisted that he did not have a drug and alcohol problem, and that he was only taking medications to treat his heart condition. To be clear, substance abuse does not automatically cause the child to be without essential parental care, control, or subsistence necessary for his or her physical or mental

well-being.  However, not knowing the nature of Father's drug use because he refuses to submit to testing is a cause for concern.

\* \* \*

Father was not incarcerated when he became involved with this case, but he did receive [notice of CYF's] termination [petition] while he was still at the ACJ.  During his time in jail, Father did not make a diligent effort to foster a parent-child relationship with [C]hildren.  [Father] only called [Foster Father] three times to speak with [C]hildren.  When asked if he made any attempts to reach out to CYF while he was incarcerated, Father testified that he did not know how.  This is not a valid excuse.  If Father truly wanted to foster a connection with [C]hildren, he would have asked what resources were available to him at the ACJ and utilized them.  The fact that he decided not to [do so] demonstrates his unwillingness to make a diligent effort to foster a relationship with [C]hildren.

Orphans' Court Opinion, 7/10/25, at 24-28 (unpaginated; footnotes, unnecessary capitalization, brackets, and quotation marks omitted).

Essentially, the orphans' court found that Father was absent from Children's lives until January 2025, which was several months after the petition to terminate his parental rights was filed; the orphans' court did not find credible Father's explanations that he was involved in Children's lives before January 2025.  Further, the court observed that Father expressed his clear desire that CYF cease all communication with him in 2023.  The court did not find Father's explanations for his absence from Children's lives—his time in jail, open warrants, and fears of arrest—to sufficiently excuse his absence.

After our review, we find that the trial court's determinations are supported by the record, and we discern no abuse of discretion or error of law.  At base, Father requests this Court to overturn the orphans' court's credibility

determination—which we must accept, as it is supported in the certified record by the testimonies of Caseworkers Mader and Weaver—that Father was not involved in Children's lives before January 2025. **See T.S.M.**, 71 A.3d at 267; **C.P.D.**, 324 A.3d at 24. Father made no effort to contact CYF until January 2025, months after he was served with the termination petition. Even if the court could consider the efforts Father made after he was served with CYF's termination petition, **see K.T.**, 296 A.3d at 1094 n.9; **C.M.**, 255 A.3d at 365, the record establishes that Father thereafter engaged minimally with CYF and failed to meaningfully make progress towards meeting his goals. We find no error or abuse in the court's rejection of Father's explanations for his absence through January 2025 based on his open warrants, fears of arrest, or CYF's failure to contact him **after Father instructed CYF to cease all contact with him in 2023**. As the court's finding that Father was absent from Children's lives through January 2025 is supported by the record, CYF established by clear and convincing evidence, **see T.S.M.**, 71 A.3d at 267; **C.P.D.**, 324 A.3d at 25, that Father, for the period of at least six months immediately preceding the filing of CYF's October 7, 2024 termination petition, refused or failed to perform parental duties for Children. **See** 23 Pa.C.S. § 2511(a)(1). Further, the court's determination that Father's post-abandonment contact with Children was insufficient is supported by the record insofar as Father met with Children only a handful of times and only made minimal, if any, progress towards his reunification goals. **See** N.T. Termination of Parental Rights/Goal Change Hearing, 5/9/25, at 162

(Caseworker Weaver testifying Father had four visits with Children during life of case); *id.* at 167 (Caseworker Weaver testifying Father has not completed any of his goals); *id.* at 228 (Caseworker Weaver testifying that Father and Mother "haven't fulfilled any of their court-ordered goals, and they wouldn't be able to provide that stability that [F]oster [P]arents are providing for [C]hildren"). We observe that this case presents a scenario squarely contemplated by this Commonwealth's case law. *See C.M.*, 255 A.3d at 364 ("A parent must exercise reasonable firmness in resisting obstacles [in] maintaining the parent-child relationship[.] Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with [. . .] physical and emotional needs."); *In re Adoption of S.P.*, 47 A.3d 817, 828 (Pa. 2012) (noting "parent has an affirmative duty to love, protect[,] and support his child and to make an effort to maintain communication and association with that child") (citation and quotation marks omitted). As we conclude the instant record supports termination of Father's parental rights to Children by clear and convincing evidence under Section 2511(a)(1), we may proceed directly to Father's final issue on appeal.

In his final issue, Father contends that the court erred insofar as it found termination to be in Children's best interest by clear and convincing evidence. Specifically, Father argues there is no record support for the trial court's finding that

Children are doing very well in [F]oster [P]arents' home [and] in finding a 'huge contrast' with their relationship to Father. [. . .] Father is clearly not a stranger to [Children]. The trial court all but ignores Dr. O'Hara's recommendations as to Father's capacities and the positive relationship reflected during the interactional [assessment].

Appellant's Brief, at 51 (internal citation omitted). Again, we find no relief is due.

When conducting a termination of parental rights analysis, if the orphans' court finds sufficient record support for termination exists pursuant to Section 2511(a), the court then proceeds to an analysis under Section 2511(b), which requires the court to "give primary consideration to the developmental, physical[,] and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b); *see also T.S.M.*, 71 A.3d at 267.

Our Supreme Court has specified that courts should assess the facts of the case in light of Section 2511(b) as follows:

[C]ourts should consider the matter from the child's perspective, placing her developmental, physical, and emotional needs and welfare above concerns for the parent.

Accordingly, the determination of the child's particular developmental, physical, and emotional needs and welfare must be made on a case-by-case basis. We have observed the law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved. Thus, the court must determine each child's specific needs.

Moreover, the child's emotional needs and welfare include intangibles such as love, comfort, security, and stability. As further guidance, we have identified factors, i.e., specific needs and aspects of the child's welfare, that trial courts must always consider. The courts must consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents. And, if the child has any bond with the biological parent,

the court must conduct an analysis of that bond, which is not always an easy task.

**K.T.**, 296 A.3d at 1105-06 (Pa. 2023) (citations, quotation marks, and footnote omitted); **see id.** at 1113 (noting Section 2511(b) inquiry must also include consideration of child's need for permanency and length of time in foster care and whether foster home meets child's developmental, physical, and emotional needs, including intangible needs of love, comfort, security, safety, and stability).

Also, "the mere existence of a bond or attachment of a child to a parent will not necessarily result in the denial of a termination petition." **T.S.M.**, 71 A.3d at 267. "It is only a necessary and beneficial bond, after all, that should be maintained[.]" **K.T.**, 296 A.3d at 1109. Bond, permanency, stability, and other intangibles are "all of 'primary' importance in the Section 2511(b) analysis." **Id.** (citation omitted). The extent of the "bond-effect analysis necessarily depends on the circumstances of the particular case." **In re Adoption of J.M.**, 991 A.2d 321, 324 (Pa. Super. 2010). On this point, "this Court has indicated that the trial court must also discern the nature and status of the parent-child bond, paying close attention to the effect on the child of permanently severing the bond." **In re T.A.C.**, 110 A.3d 1028, 1033 (Pa. Super. 2015) (citation and quotation marks omitted).

> In this context, the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship. When conducting a bonding analysis, the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation.

*In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010) (citations omitted).

This Court has explained how courts should consider the affection which a child may have for his or her biological parents, as follows:

> [C]oncluding a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound. If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse, is able to sift through the emotional wreckage and completely disavow a parent. The continued attachment to the natural parents, despite serious parental rejection through abuse and neglect, and failure to correct parenting and behavior disorders which are harming the children cannot be misconstrued as bonding. Nor are we of the opinion that the biological connection between [the parent] and the children is sufficient in [and] of itself, or when considered in connection with a child's feeling toward a parent, to establish a *de facto* beneficial bond exists. The psychological aspect of parenthood is more important in terms of the development of the child and its mental and emotional health than the coincidence of biological or natural parenthood.

*In re K.K.R. S.*, 958 A.2d 529, 535 (Pa. Super. 2008) (citations and quotation marks omitted). Indeed, this Court has specified that it is "within the discretion of the orphans' court to prioritize the safety and security" of children "over their bonds with their parents." *M.E.*, 283 A.3d at 839. Finally, to meet its burden, CYF, as the petitioner seeking termination of parental rights, must prove by clear and convincing evidence that termination best serves the child's needs and welfare. *K.T.*, 296 A.3d at 1114 (footnote omitted).

Instantly, the orphans' court evaluated Children's best interests pursuant to Section 2511(b) as follows:

> Here, this court heard testimony from [] caseworkers that [C]hildren were thriving in their foster home [with Foster Parents]. [F]oster [P]arents were attentive to their needs, took great care in providing a stable environment for them, and also ensured that their medical and educational needs were being met. [The] caseworkers testified that [C]hildren seemed comfortable around [F]oster [P]arents, and that A.R.P., who was non-verbal for most of her life, even started talking more. This is a huge contrast to [C]hildren's relationship with Father because he is still virtually a stranger to them. Not only do they still refer to him by his first name, but their only interactions with him have been supervised. [. . .] F.P. had nightmares following one of the visits with Father, [which] should [not] be taken lightly. If anything, it suggests that it would take more time for [C]hildren to not only feel comfortable around Father, but [also] to form a bond with him.

Orphans' Court Opinion, 7/10/25, at 29-30 (unpaginated; unnecessary capitalization omitted).

After our review, we again find the trial court's determinations to be supported in the record and we discern no abuse of discretion or error of law. The various caseworkers' testimonies provide the necessary support for the court's finding that termination of Father's parental rights to Children serves Children's best interests by clear and convincing evidence. *See Z.P.*, 994 A.2d at 1121; *see also* N.T. Termination of Parental Rights/Goal Change Hearing, 5/9/25, at 136-39 (Caseworker Mader testifying that: (1) Children were thriving with Foster Parents, A.R.P. started talking more, Foster Parents and Children shared a loving and affectionate bond, Children sought out Foster Parents for comfort, Children did not like to leave Foster Parents' home to visit with Father, and Caseworker Mader had concerns if Children were removed from Foster Parents' home; (2) Foster Parents provided most stable environment Children ever experienced; and (3) she did not think Children

would suffer any detriment if Father's rights were terminated, and that it would be more harmful to end their relationship with Foster Parents); N.T. Termination of Parental Rights/Goal Change Hearing, 5/9/25, at 163 (Caseworker Weaver testifying that: (1) Children were bonded with Foster Parents and F.P. asked her how to write "I love you, Angela and Johnny," A.R.P. was curled up with Foster Father, Children turned to Foster Parents for answers to questions; (2) Foster Parents provided Children with stable environment and participated in all medical and developmental needs, which were being met; and (3) Foster Parents seemed very happy and invested in Children); *id.* at 167-68 (Caseworker Weaver testifying that Children were out of biological parents' care for twenty-three months and in Foster Parents' care for twenty of those months); *id.* at 178-80 (Caseworker Marshall testifying that: (1) she had no concerns regarding Foster Parents' home; (2) Children get everything they want, including a lot of attention in Foster Parents' home; (3) whenever she visited Foster Parents' home, at least one of the Children was sitting on a Foster Parent's lap; (4) Children seemed happy, content, and secure in their placement; and (5) Caseworker Marshall was aware that F.P. cried after interactional assessment due to fear that Foster Parents would leave her). Accordingly, we conclude that Father is not entitled to relief on this final issue. Thus, we affirm the orders terminating Father's parental rights to Children.

Orders affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: <u>11/12/2025</u>